UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| **TAMMIE LIBBY,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **No.2:10-cv-292-JAW** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant** | ) | |

## REPORT AND RECOMMENDED DECISION[1]

This Social Security Disability ("SSD") and Supplemental Security Income ("SSI")
appeal, which challenges the commissioner's determination that the plaintiff was capable of
performing work existing in significant numbers in the national economy, squarely raises the
question of whether this court has correctly construed the so-called "capsule definition"
requirement of Listing 12.05, Appendix 1 to Subpart P, 20 C.F.R. § 404 (the "Listings"),
pertaining to mental retardation. I recommend that the court overrule its existing precedent on
this narrow issue and affirm the decision of the commissioner.

On June 27, 2008, the plaintiff filed both SSD and SSI applications alleging an onset of
disability on January 15, 2006. *See* Record at 12. Both claims were denied initially on August
21, 2008. *See id.* On September 15, 2008, the plaintiff filed a request for reconsideration, and
on January 14, 2009, on reconsideration, she was found disabled for purposes of both SSD and

---

[1] This action is properly brought under 42 U.S.C. §§ 405(g) and 1383(c)(3). The commissioner has admitted that the
plaintiff has exhausted her administrative remedies. The case is presented as a request for judicial review by this
court pursuant to Local Rule 16.3(a)(2)(A), which requires the plaintiff to file an itemized statement of the specific
errors upon which she seeks reversal of the commissioner's decision and to complete and file a fact sheet available
at the Clerk's Office. Oral argument was held before me on June 15, 2011, pursuant to Local Rule 16.3(a)(2)(C),
requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes,
regulations, case authority, and page references to the administrative record.

SSI, but only as of October 9, 2008. *See id.* She filed a written request for a hearing before an administrative law judge, seeking, in relevant part, a determination that she had been disabled as of her claimed onset date, January 15, 2006. *See id.* That hearing culminated in the decision from which the plaintiff has taken the instant appeal. *See id.*

Pursuant to the commissioner's sequential evaluation process, 20 C.F.R. § 405.101 (incorporating 20 C.F.R. §§ 404.1520, 416.920); *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the administrative law judge found, in relevant part, that the plaintiff had severe impairments of borderline intellectual functioning, diabetes, knee arthritis, and obesity, Finding 3, Record at 15; that she did not have an impairment or combination of impairments that met or medically equaled one of the Listings, Finding 4, *id.* at 17; that she had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she could perform frequent handling, required the opportunity to alternate sitting and standing every hour for five to 10 minutes, and was limited to the performance of simple tasks requiring occasional use of simple mathematics, such as counting, with reading and writing limited to lists, Finding 5, *id.* at 20; that, considering her age (45 years old, defined as a younger individual, on the alleged disability onset date), education (marginal), work experience (transferability of job skills immaterial), and RFC, there were jobs existing in significant numbers in the national economy that she could perform, Findings 7-10, *id.* at 24; and that she, therefore, was not disabled from January 15, 2006, her alleged disability onset date, through February 26, 2010, the date of the decision, Finding 11, *id.* at 26.[2] The Decision Review Board selected the decision for review but failed to act within 90 days, *id.* at 6-

---

[2] The plaintiff was insured for purposes of SSD benefits through March 31, 2009, *see* Finding 1, Record at 14, and, therefore, to obtain SSD benefits, was obliged to demonstrate that she was disabled on or before that date, *see Mueller v. Astrue*, 561 F.3d 837, 840 (8th Cir. 2009).

8, making the decision the final determination of the commissioner, 20 C.F.R. § 405.420(a)(2); *Dupuis v. Secretary of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). In other words, the determination must be supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion drawn. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The administrative law judge reached Step 5 of the sequential evaluation process, at which stage the burden of proof shifts to the commissioner to show that a claimant can perform work other than her past relevant work. 20 C.F.R. § 405.101 (incorporating 20 C.F.R. §§ 404.1520(g), 416.920(g)); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Goodermote*, 690 F.2d at 7. The record must contain substantial evidence in support of the commissioner's findings regarding the plaintiff's RFC to perform such other work. *Rosado v. Secretary of Health & Human Servs.*, 807 F.2d 292, 294 (1st Cir. 1986).

The plaintiff's statement of errors also implicates Steps 2 and 3 of the sequential evaluation process. Although a claimant bears the burden of proof at Step 2, it is a *de minimis* burden, designed to do no more than screen out groundless claims. *McDonald v. Secretary of Health & Human Servs.*, 795 F.2d 1118, 1124 (1st Cir. 1986). When a claimant produces evidence of an impairment, the commissioner may make a determination of non-disability at Step 2 only when the medical evidence "establishes only a slight abnormality or [a] combination of slight abnormalities which would have no more than a minimal effect on an individual's

ability to work even if the individual's age, education, or work experience were specifically considered." *Id.* (quoting Social Security Ruling 85-28).

At Step 3, a claimant bears the burden of proving that his or her impairment or combination of impairments meets or equals a listing. 20 C.F.R. § 405.101 (incorporating 20 C.F.R. § 404.1520(d)); *Dudley v. Secretary of Health & Human Servs.*, 816 F.2d 792, 793 (1st Cir. 1987). To meet a listing, the claimant's impairment(s) must satisfy all criteria of that listing, including required objective medical findings. 20 C.F.R. § 405.101 (incorporating C.F.R. § 404.1525(c)(3)). To equal a listing, the claimant's impairment(s) must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 405.101 (incorporating 20 C.F.R. § 404.1526(a)).

## I. Discussion

The plaintiff argues that the administrative law judge erred in (i) finding a severe impairment of borderline intellectual functioning rather than mild mental retardation, (ii) failing to apply relevant principles in assessing whether the plaintiff's IQ scores met Listing 12.05C, and (iii) failing to develop the record with respect to the plaintiff's math and language skills. *See* Plaintiff's Itemized Statement of Specific Errors ("Statement of Errors") (Docket No. 12) at 5-12.[3] I find no reversible error and, accordingly, recommend that the court affirm the decision.

### A. Step 2 Finding: Borderline Intellectual Functioning

The record contains reports of both examining and nonexamining Disability Determination Services ("DDS") mental-health consultants, completed in connection with a prior application, *see* Record at 12, as well as in connection with the plaintiff's 2008 applications.

---

[3] At the commissioner's request, and without objection, I permitted him in advance of oral argument to file a memorandum of law addressing whether this court should reconsider its interpretation of the capsule definition requirement of Listing 12.05. *See* Defendant's Pre-Hearing Memorandum of Law ("Defendant's Brief") (Docket No. 19).

DDS examining consultant Roger Ginn, Ph.D., completed two reports, one dated February 17, 2006, *see id.* at 879-81, and the other dictated on October 9, 2008, *see id.* at 543-45. In 2006, Dr. Ginn administered a Wechsler Adult Intelligence Scale – III ("WAIS – III") test, determining that the plaintiff had a verbal IQ score of 67, a performance IQ score of 80, and a full-scale IQ of 71. *See id*. at 880. He commented that she put good effort into the evaluation, did not have any difficulty understanding or following directions, and showed good persistence in her ability to concentrate. *See id*. He deemed the scores valid and diagnosed her with borderline intellectual functioning – not mental retardation. *See id*. at 880-81.

In his 2008 report, Dr. Ginn made no reference to his 2006 report. *See id*. at 543-45. Based on a fresh administration of the WAIS – III test, he determined that the plaintiff had a verbal IQ score of 67, a performance IQ score of 73, and a full-scale IQ score of 67. *See id*. at 544. He again commented that she put good effort into the evaluation, did not have any difficulty understanding or following directions, and showed good persistence and an ability to concentrate. *See id*. He deemed these scores valid and diagnosed her with mild mental retardation. *See id*. at 544-45.

In 2006, Dr. Ginn found the plaintiff's scores "consistent with her educational and occupational history and also consistent with an individual who would have significant reading problems." *Id*. at 881. In 2008, he also found her scores "consistent with her educational and occupational history [and] not suggestive of any significant decline in functioning." *Id*. at 545.

On March 30, 2006, with the benefit of review of the 2006 Ginn report, a DDS nonexamining consultant, Thomas Knox, Ph.D., completed a Psychiatric Review Technique form ("PRTF") in which he found the plaintiff to have borderline intellectual functioning that did not precisely satisfy the criteria of Listing 12.02, pertaining to organic mental disorders, as well

as an adjustment disorder that did not precisely satisfy the criteria of Listing 12.04, pertaining to affective disorders. *See* Record at 863, 865, 874. He did not find the plaintiff to have satisfied any of the criteria of Listing 12.05, pertaining to mental retardation. *See id*. at 866.

On December 10, 2008, with the benefit of the 2008 Ginn report, a different DDS nonexamining consultant, Scott W. Hoch, Ph.D., completed two separate PRTFs, one covering the period from January 15, 2006, through October 8, 2008, *see id*. at 555-67, and one covering the period from October 9, 2008, through the present, *see id*. at 569-81. Dr. Hoch indicated that, during the earlier period, the plaintiff had a medically determinable impairment of depression that did not precisely satisfy the criteria of Listing 12.04 and an unnamed medically determinable impairment that did not precisely satisfy the criteria of Listing 12.05, although, with respect to the latter listing, she had (i) significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period and (ii) a valid verbal, performance, or full-scale IQ of 60 through 70. *See id*. at 558-59. In the space in which he was asked to describe the Listing 12.05 disorder that did not precisely meet the diagnostic criteria of that listing, he wrote: "IQ appear valid for her[.]" *Id*. at 559.

In Dr. Hoch's second PRTF, covering the period after October 8, 2008, he found that the plaintiff met Listing 12.05 as of that time, again checking the box indicating that she had significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period and, this time, checking a box indicating that she had a valid verbal, performance, or full-scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. *See id*. at 573. He explained that the plaintiff met Listing 12.05 when her depression became

moderate.  *See id.* at 581.  He indicated that, prior to October 9, 2008, her depression was nonsevere.  *See id.*

The administrative law judge found that the plaintiff suffered from a severe condition of borderline intellectual functioning rather than mental retardation, explaining:

> Despite having examined the [plaintiff] two years earlier, Dr. Ginn concluded that the new scores were consistent with her educational and occupational history and were not suggestive of any significant decline in functioning.  As in the earlier 2006 examination, Dr. Ginn assessed a GAF [Global Assessment of Functioning] of 60.  The undersigned finds Dr. Ginn's opinion internally inconsistent and finds that he failed to address that he previously found the [plaintiff] was not mentally retarded.  Dr. Ginn's opinions also do[] not discuss or identify any evidence of significantly sub average general intellectual functioning with deficits in adaptive functioning initially manifested prior to age 22 as required by Medical Listing 12.05.

*Id.* at 15 (citation omitted).[4]

The plaintiff argues that the administrative law judge's reasons for discounting Drs. Ginn's and Hoch's finding of mental retardation do not withstand scrutiny and, in any event, she impermissibly intervened in their area of professional expertise, substituting her judgment for theirs.  *See* Statement of Errors at 5-8.  I disagree.

The administrative law judge was confronted with conflicting evidence as to whether the plaintiff suffered from borderline intellectual functioning or mental retardation.  Rather than intruding into the professionals' area of expertise, she resolved a clear conflict in the record between Dr. Ginn's 2006 and 2008 findings.  That is precisely what administrative law judges are tasked to do.  *See, e.g., Rodriguez*, 647 F.2d at 222 ("The Secretary may (and, under his

---

[4] A GAF score represents "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., text rev. 2000) ("DSM-IV¬TR"), at 32.  The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning."  *Id.*  The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  *Id.* at 34.  A GAF score of 51 to 60 represents "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)."  *Id.* (boldface omitted).

regulations, must) take medical evidence.  But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts.").

In turn, her resolution of this particular conflict was supported by substantial evidence. Dr. Ginn did not explain how a diagnosis of borderline intellectual functioning and a diagnosis of mild mental retardation *both* could have been consistent with the plaintiff's educational and occupational history, particularly in circumstances in which, in 2008, he found that the plaintiff's IQ scores were not suggestive of any significant decline in functioning.  *Compare* Record at 545 *with id.* at 881.  This was a rational basis on which to accord the later finding less weight.[5]

### B.  Step 3 Finding: Listing 12.05C

Listing 12.05 provides, in relevant part:

> 12.05    *Mental Retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period: *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> ***
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

Listing 12.05.

---

[5] The plaintiff suggests that the administrative law judge was obliged to credit Dr. Ginn's 2008 report over his 2006 report because "the black-letter principle for Social Security disability determination is to credit the lowest of the various scores rather than to rely on a diagnostic statement[,]" a proposition for which she cites Listing 12.00D(6)(c).  Statement of Errors at 7.  However, that listing, on its face, addresses only the crediting of the lowest score obtained on administration of a *single* test.  *See* Listing 12.00D(6)(c) ("In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05.").

# 1. Administrative Law Judge's 12.05 Determination

The administrative law judge rejected the finding made by the DDS on reconsideration that the plaintiff met Listing 12.05 as of October 9, 2008, stating that "the State agency granting benefits made fundamental errors of law in applying 12.05C, particularly no evidence with respect to deficits in adaptive functioning." Record at 17.

The administrative law judge reasoned:

> Although admittedly the [plaintiff] only attended school through the 8th grade and has limitations in reading and math, she also acquired a driver's license without special assistance, drove regularly at the time of the consultative examination with Dr. Ginn, and had married and was raising her children. By Dr. Ginn's own admission, the [plaintiff] did not have any difficulty understanding or following directions and showed good persistence and an ability to concentrate during the examination. Dr. Ginn opined that her IQ scores were consistent with her educational and occupational history and not suggestive of any decline in functioning. Dr. Ginn noted some chronic pain reported at a scale of 8-9 during the evaluation, but failed to recognize the [plaintiff's] own report that she had just had "foot surgery" before the evaluation and most significantly, there were no reported medications for pain. Despite the above, Dr. Ginn still found the [plaintiff] could get along adequately with people if she was physically able to do the job and she could deal with work related stress as long as the job was in line with her limited capabilities. Although Dr. Ginn concluded the [plaintiff] was experiencing mild to moderate depression, in his examination, he found that she exhibited "no outward manifestations of significant anxiety or affective disturbance." Dr. Ginn also opined that her math skills were adequate to manage her own funds.

*Id*. at 18 (citations omitted).

The administrative law judge also stated that, in addition to producing an internally inconsistent 2008 report, Dr. Ginn failed to recognize that he had examined the plaintiff on February 17, 2006, with significantly different clinical findings and different IQ results, and had reached a markedly different opinion. *See id*. She listed a number of ways in which, in her view, the plaintiff demonstrated a lack of deficits in adaptive functioning, including the following:

1.      Dr. Ginn noted in 2006 that she was working in a variety store two to four hours per day, five days a week, and hoped to get more hours because she had no problems with the job other than lack of hours, *see id.*;

2.      Although in 2006 the plaintiff reported poor reading skills, Dr. Ginn noted that she had taken and passed her driver's license examination, a fact assertedly inconsistent with the lack of adaptive functioning necessary to find mental retardation, *see id.*;

3.      Dr. Ginn noted no difficulty understanding or following directions and good persistence and concentration, *see id.*;

4.      Despite the plaintiff's limited math abilities, she testified that she did the family bills, managed the checking account, and wrote the checks, although she testified that, if she had a question, she would ask her daughter, *see id.* at 18-19;

5.      The plaintiff testified that (i) she was surprised to find that she was mentally retarded, (ii) she has difficulty reading but can read and write a shopping list with simpler words, and (iii) she lives with her husband in an apartment and takes care of him because he is disabled and also cares for two cats, a bird, and some fish, *see id.* at 19;

6.      The plaintiff reported that she liked working at the convenience store making pizzas and sandwiches, although she had trouble running the cash register because of her limited math skills, and she would have been able to look for other food preparation jobs further from home if she had a car, *see id.*; and

7.      The plaintiff testified that, after her foot surgery, she performed a wide range of daily activities, which the administrative law judge found inconsistent with a finding of mental retardation, *see id.*

### 2. Parties' Positions

The plaintiff argues, as a threshold matter, that pursuant to this court's long-standing interpretation of the Listing 12.05 capsule definition, the administrative law judge erred as a matter of law in reversing the finding that she had met the listing on the ground that she failed to demonstrate deficits in adaptive functioning. *See* Statement of Errors at 8 ("The caselaw of this district has been consistent in holding that the 'adaptive functioning' requirement of the listing (the so-called 'capsule requirement') is satisfied when a claimant demonstrates 'that mental retardation, as gauged by IQ testing, manifested itself before age 22.'") (quoting *Mace v. Astrue*, Civil No. 08-14-BW, 2008 WL 4876857, at *4 (D. Me. Nov. 11, 2008) (rec. dec., *aff'd* Dec. 24, 2008). She argues that, on the record presented, the commissioner failed to rebut the presumption that IQ remains constant throughout a person's life and, hence, she should have been found to have satisfied the capsule definition and to have met Listing 12.05C. *See id.* at 8-9.

The commissioner squarely challenges this court's caselaw interpreting the Listing 12.05 capsule definition, asserting that it rests upon regulatory language superseded by a set of 2000 revisions that made clear that claimants must make a showing of deficits in adaptive functioning. *See* Defendant's Brief at 3-5. He urges the court to follow the lead of a majority of courts, including the United States Court of Appeals for the Fifth Circuit in *Randall v. Astrue*, 570 F.3d 651 (5th Cir. 2009), and so hold. *See id.* at 6-9. At oral argument, his counsel argued that, pursuant to this correct interpretation of the capsule definition, the administrative law judge permissibly found that the plaintiff had failed to meet her Step 3 burden of showing the requisite deficits in adaptive functioning.

In rebuttal at oral argument, the plaintiff's counsel urged the court to stay the course in its construction of the capsule definition. Alternatively, he argued that, even if the court follows *Randall*, the result is no different here because the administrative law judge's finding of a failure to show deficits in adaptive functioning is flawed and unsupported by substantial evidence.

### 3. Analysis

#### a. Interpretation of the Capsule Definition of Listing 12.05C

The question of whether this court has correctly interpreted the capsule definition of Listing 12.05C is dispositive of this case. Pursuant to this court's caselaw construing Listing 12.05, including *Mace*, the plaintiff would succeed in her appeal. There is no dispute that she meets the severity requirements of subsection C by virtue of (i) her IQ scores, both in 2006 and 2008, and (ii) the administrative law judge's finding that she suffered from other severe impairments. Moreover, the commissioner does not suggest that he can rebut the presumption that her IQ has remained constant since prior to age 22. However, while the plaintiff contends that, even adopting the construction of the capsule definition set forth in *Randall*, she still meets Listing 12.05C, for the reasons discussed *infra*, I disagree.

Upon careful examination of this court's relevant precedents and the authorities cited by the commissioner in his pre-hearing memorandum, I conclude, and recommend that the court find, that the capsule definition of Listing 12.05 as revised in 2000 requires a claimant to demonstrate deficits in adaptive functioning. Accordingly, I recommend that the court overrule its prior caselaw to the extent that it holds otherwise.

This court's line of caselaw construing the Listing 12.05 capsule definition originated with *Ouellette v. Apfel*, No. 00-112-P-H, 2000 WL 1771122 (D. Me. Dec. 4, 2000) (rec. dec.,

*aff'd* Dec. 29, 2000), which construed the language of the capsule definition as it existed prior to the 2000 revisions. In *Ouellette*, the court observed:

> [A]t least five circuit courts of appeals have addressed the language in Listing 12.05 describing "deficits in adaptive behavior initially manifested during the developmental period (before age 22)." The language has been construed to impose what amounts to an additional requirement; however, it consistently has been described merely as a requirement that the claimant's mental retardation have manifested itself before age 22.
>
> \*\*\*
>
> I find no published case in which a federal court, on the strength of the preamble language at issue here, peered behind the veil of the diagnosis of mental retardation to establish whether a claimant specifically manifested deficits in adaptive behavior prior to age 22. This is not surprising, inasmuch as the preamble language essentially defines the condition of mental retardation – *i.e.*, "a significantly subaverage intellectual functioning with deficits in adaptive behavior" – and then goes on to impose the limitation that the condition have "initially manifested during the developmental period." It would be neither necessary nor appropriate for the commissioner to dissect the plaintiff's specific deficits in adaptive behavior (or lack thereof) inasmuch as her IQ test score, the validity of which he has not questioned, established that for purposes of Listing 12.05 she was "mentally retarded."

*Ouellette*, 2000 WL 1771122, at \*3 (citations and footnotes omitted). This court has continued to embrace the proposition that "satisfaction of the numerical IQ standard satisfies the Listing's reference to 'deficits in adaptive behavior' as well[,]" at least absent evidence rebutting a presumption that IQ remains stable over time. *Harthorne v. Astrue*, Civil No. 08-120-B-W, 2008 WL 4937806, at \*8 (D. Me. Nov. 16, 2008) (rec. dec., *aff'd* Dec. 8, 2008).[6] Pursuant to this line of cases, satisfaction of the capsule definition entails production of valid IQ scores indicative of mental retardation and, if those scores were obtained subsequent to age 22, a failure on the part

---

[6] Cases in which this court has taken this position, besides *Ouellette*, *Harthorne*, and *Mace*, include *Sturtevant v. Barnhart*, No. 04-188-B-W, 2005 WL 1353727, at \*4 (D. Me. June 7, 2005) (rec. dec., *aff'd* June 27, 2005), and *Lombard v. Barnhart*, No. 02-146-B-W, 2003 WL 22466178, at \*3 (D. Me. Oct. 31, 2003) (rec. dec., *aff'd* Nov. 18, 2003). The commissioner argues, *inter alia*, that in *Harthorne* and *Mace*, this court mischaracterized *Ouellette*'s interpretation of the capsule definition as a holding rather than as dictum. *See* Defendant's Brief at 2-3. Regardless of whether that is so, this court has in effect adopted that position as its holding.

of the commissioner to rebut a presumption that such scores remain constant throughout a person's life.

Nonetheless, as the commissioner points out, *see* Defendant's Brief at 3-4, Listing 12.05 was revised in 2000 to define mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period: *i.e.*, *the evidence demonstrates or supports* onset of the impairment before age 22." Listing 12.05 (emphasis added). In making that revision, the commissioner clarified: "Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment *satisfies the diagnostic description* in the introductory paragraph *and* any one of the four sets of criteria, we will find that your impairment meets the listing." Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50776 (Aug. 21, 2000) (emphasis added). *See also* Listing 12.00A (incorporating same); Listing 12.00D(6)(a) ("The results of standardized intelligence tests may provide data that help verify the presence of mental retardation . . ., as well as the extent of any compromise in cognitive functioning. However, since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation.").

Two years later, in a 2002 comment rebuffing a recommendation that the commissioner use the definition of mental retardation found in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) ("DSM-IV"), the commissioner made even clearer that a demonstration of mental retardation sufficient to meet Listing 12.05 entails discrete showings of a qualifying valid IQ score and deficits in adaptive functioning:

The definition of MR [mental retardation] that we use in our listings is consistent with, if not identical to, the definitions of MR used by the leading professional organizations. The four major professional organizations in the United States that deal with MR have each established their own definition of MR. While all the definitions require significant deficits in intellectual functioning, as evidenced by IQ scores of approximately 70 or below, age of onset and the method of measuring the required deficits in adaptive functioning differ among the organizations.

For example, the definition of MR used in the DSM-IV is predominantly based on (but not identical to) the revised definition of MR promulgated by the American Association on Mental Retardation (AAMR) in 1993. The DSM-IV states: "The essential feature of mental retardation is significantly subaverage general intellectual functioning (further defined as an IQ standard score of approximately 70 or below), that is accompanied by significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. The onset must occur before age 18 years."

Following publication of this new definition of MR by the AAMR, the American Psychological Association published its own "Manual of Diagnosis and Professional Practice in Mental Retardation, 1996." It states: "Mental retardation refers to (a) significant limitations in general intellectual functioning; (b) significant limitations in adaptive functioning, which exist concurrently; and (c) onset of intellectual and adaptive limitations before the age of 22 years." In its definition, (a) is defined as "*** an IQ or comparable normed score that is two or more standard deviations below the population mean for the measure;" and for (b), "*** the criterion of significance is a summary index score that is two or more standard deviations below the mean ***."

The definition of MR used by SSA [Social Security Administration] in the listings is not restricted to diagnostic uses alone, nor does it seek to endorse the methodology of one professional organization over another. While capturing the essence of the definitions used by the professional organizations, it also is used to determine eligibility for disability benefits. SSA's definition establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations.

Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018, 20020 (Apr. 24, 2002).

Primarily in view of the 2000 revision instructing that claimants must satisfy both the diagnostic description (that is, the capsule definition) and any one of four sets of severity criteria

(that is, any of subsections A through D), the *Randall* court joined at least three, and possibly four, other United States circuit courts of appeals, *see Randall*, 570 F.3d at 660, in holding: "No matter what Listing 12.05 required before 2000, the clarifying revisions best evince the relationship between the diagnostic description's components and the severity criteria. Accordingly, we join those circuits that pay close attention to that change[,]" *id*. at 662.

The *Randall* court's reasoning is persuasive, and I recommend that this court, as well, construe the capsule definition to require a separate showing of deficits in adaptive functioning.[7] This, however, begs two additional questions: what are deficits in adaptive functioning, and are the only relevant deficits those shown prior to age 22?

With respect to the first question, counsel for the commissioner suggested at oral argument that this court again follow the lead of the United States Court of Appeals for the Fifth Circuit and look to Listing 12.00C(1), which defines "activities of daily living" to "include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." Listing 12.00C(1). *See Arce v. Barnhart*, 185 Fed. Appx. 437, 438 (5th Cir. 2006).

---

[7] In further support of this recommended holding and as noted by counsel for the commissioner, *see* Defendant's Brief at 8, the First Circuit has at least signaled, if not squarely held, that the Listing 12.05 capsule definition should be construed to require a showing of deficits in adaptive functioning. *See Morales v. Commissioner of Soc. Sec.*, 2 Fed. Appx. 34, 37 (1st Cir. 2001) ("The problem with claimant's argument [that her condition met or equaled Listing 12.05] is that there simply is no evidence in the record that claimant had any 'deficits in adaptive behavior initially manifested . . . before age 22.' Indeed, claimant herself reported to Dr. de Jesus that, prior to 1992, she had been physically and emotionally healthy. Further, claimant stated that she had obtained fair grades through the sixth grade and had left school due to a skin condition. Thus, claimant has failed to establish that she fits within the basic definition of mental retardation set out in § 12.05."). The *Randall* court cited *Morales* as among "[u]npublished opinions from three other circuits [that] support our construction." *Randall*, 570 F.3d at 661 & n.22.

With respect to the second question, the plaintiff contends that the administrative law judge incorrectly focused on her functionality since, rather than prior to, age 22. *See* Statement of Errors at 9.

While Listing 12.00C(1) provides a relevant and helpful list of activities constituting adaptive functioning, I am unpersuaded that it catalogues the entire universe of such activities. As the commissioner noted in 2002, his Listing 12.05 capsule definition "allow[s] use of any of the measurement methods recognized and endorsed by the professional organizations." 67 Fed. Reg. at 20020. The commissioner observed, for example, that the definition of mental retardation in the DSM-IV includes "significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Id*. Consistent with this, my research indicates that courts have looked to definitions other than, or in addition to, that provided in Listing 12.00C(1). *See, e.g., Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) ("The key term in the introductory paragraph of section 12.05 of the regulation, so far as bears on this case, is 'deficits in adaptive functioning.' The term denotes inability to cope with the challenges of ordinary everyday life.") (citing DSM-IV-TR); *Goelling v. Astrue*, Civil Action No. 7:09cv00225, 2010 WL 3733538, at *3-*4 (W.D. Va. Aug. 30, 2010) (relying, in construing meaning of "adaptive functioning" in capsule definition of Listing 12.05, on DSM-IV passage defining phrase to "refer[] to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting") (quoting DSM-IV at 42).

I am also unpersuaded that the capsule definition requires exclusive focus on a claimant's deficits in adaptive functioning *prior to* age 22. Both the DSM-IV and the American Psychological Association definitions of mental retardation quoted by the commissioner in his 2002 commentary contemplate *current* deficits in intellectual and adaptive functioning, with *onset* of those deficits during the developmental period. *See* 67 Fed. Reg. at 20020. Courts construing the capsule definition of Listing 12.05 have considered evidence of a claimant's current adaptive functioning relevant to, and even dispositive of, the question of whether that definition is satisfied. *See, e.g., Novy*, 497 F.3d at 710 (administrative law judge "was entitled to conclude, without courting reversal[,]" that claimant did not meet Listing 12.05 capsule definition when, despite her intellectual limitations, she lived on her own, taking care of children without help, paid her bills, and avoided eviction); *Monroe v. Astrue*, 726 F. Supp.2d 1349, 1355 (N.D. Fla. 2010) ("If a claimant has been able to adapt in functioning after age 22, it is permissible to find that Listing 12.05C has not been met.") (footnote omitted); *Mayweather v. U.S. Comm'r of Soc. Sec. Admin.*, Civil Action No. 08-cv-0391, 2009 WL 311099, at *3 (W.D. La. Feb. 9, 2009) ("Plaintiff's current conditions, obviously, are not the most direct evidence of whether he had deficits in adaptive functioning before age 22, but it is certainly relevant evidence.").[8]

---

[8] To the extent that the capsule definition of Listing 12.05 requires, in addition to a showing of deficits in adaptive functioning, a showing of "significantly subaverage general intellectual functioning" initially manifested prior to age 22, the commissioner offers no reason to disturb this court's position that "an IQ is presumed to remain stable over time in the absence of evidence to the contrary[.]" *Harthorne*, 2008 WL 4937806, at *8. *See also, e.g.*, 65 Fed. Reg. at 50753 (stating, in conjunction with 2000 rule revision that, as regards Listing 12.05, "[t]he final rules clarify that we do not necessarily require evidence from the developmental period to establish that the impairment began before the end of the developmental period. The final rules permit us to use judgment, based on current evidence, to infer when the impairment began. This is not a change in interpretation from the prior rules."); *Hodges v. Barnhart*, 276 F.3d 1265, 1268 (11th Cir. 2001) ("Acknowledging the lack of IQ evidence before age twenty-two, Hodges asserts that absent evidence of sudden trauma that can cause retardation, the IQ tests create a rebuttable presumption of a fairly constant IQ throughout her life. We agree. Other appellate courts have recognized this presumption finding that IQ's remain fairly constant throughout life.").

### b. Application to Facts of This Case

With this understanding of the requirements of Listing 12.05, I proceed to consider whether the administrative law judge supportably determined that the plaintiff did not meet that listing. I conclude, and recommend that the court find, that she did.

At oral argument, the plaintiff's counsel attacked that determination on two principal bases: that the administrative law judge substituted her judgment for that of the experts (Drs. Ginn and Hoch) in concluding that the plaintiff had not shown the requisite deficits in adaptive functioning and that, in any event, the administrative law judge wrongly characterized and otherwise misconstrued the body of evidence on which she relied.

With respect to the first point, the plaintiff minimizes the fact that the record contains conflicting *expert* evidence as to whether she met Listing 12.05C. Dr. Ginn found in 2006 that she suffered from borderline intellectual functioning, based on overall IQ scores consistent with her educational and occupational history. *See* Record at 881. In 2008, without explanation for the discrepancy, he found her mildly mentally retarded, based on overall IQ scores consistent with her educational and occupational history, even though he found that her 2008 IQ scores did not represent a significant decline in functioning. *See id*. at 545. While Dr. Hoch concluded, on the strength of the 2008 Ginn report, that the plaintiff met Listing 12.05C, *see* Record at 569, 573, Dr. Knox concluded, with the benefit of the 2006 Ginn report, that she did not, *see id*. at 866. The administrative law judge thus did not substitute her judgment for that of the experts. Rather, she resolved conflicts in the expert medical evidence, principally the conflict between the 2006 and 2008 Ginn reports. In that regard, this case is materially distinguishable from *Nieves v. Secretary of Health & Human Servs*., 775 F.2d 12 (1st Cir. 1985), on which the plaintiff relies. *See Nieves*, 775 F.2d at 14 (in assessing whether the claimant met Listing 12.05C, the

administrative law judge erroneously discredited the only IQ scores of record; commissioner "is simply not at liberty to substitute [his] own opinions of an individual's health for uncontroverted medical evidence").

With respect to the second point, despite the plaintiff's challenges to the relevance and/or accuracy of the characterization of many of the facts on which the administrative law judge relied, the finding regarding adaptive functioning on the whole is supported by substantial evidence. The plaintiff had obtained a driver's license, although, as counsel for the commissioner conceded at oral argument, there is no evidence that she obtained it without special assistance. *See* Record at 880. She drove regularly. *See id*. at 544. She was able to perform household activities of daily living such as cooking, cleaning, helping take care of her disabled husband, and occasionally babysitting her grandchildren. *See id*. at 197-99, 965-66. She engaged in leisure/social activities such as watching television, playing Bingo, going dancing, playing cards, coloring with her grandchildren, and having phone conversations. *See id*. at 201. She could read a shopping list and write most of a shopping list. *See id*. at 957. She could count change, handle a savings account, and use a checkbook/money order, although she could not pay bills. *See id*. at 200. She took care of two cats, a bird, and fish, with assistance from her daughter in cleaning the fish tank. *See id*. at 971-72.

Dr. Ginn noted, both in 2006 and in 2008, that the plaintiff did not have difficulty understanding or following directions and showed good persistence and concentration. *See id*. at 544, 880. Dr. Ginn felt that, if awarded benefits, she could manage her own funds. *See id*. at 545, 881. While she had difficulty running a cash register because of her poor math skills, she had no trouble with a food preparation job, other than lack of available work hours. *See id*. at 543, 880, 986-87.

At oral argument, the plaintiff's counsel highlighted evidence of record suggesting that the plaintiff did have difficulties in adaptive functioning both prior to and after age 22, which in his view sufficed to meet even the *Randall* test. As he pointed out, there is evidence that his client was in special education at school, *see id*. at 97, attended school only through the 8th grade, *see id*., tried but failed to obtain a GED, *see id*. at 97, 974, was told she was reading at a 4th grade level, *see id*., got lost when she tried to take buses, *see id*. at 973, is illiterate with a computer, *see id*. at 971, had difficulty running the cash register at work, *see id*. at 986-87, relied on her daughter to help with her disability application, *see id*. at 957, and must turn to her daughter for help when she gets in a "clunch" or "clinch" doing bills, *see id*. at 970.

Certainly, the evidence as a whole does not compel a conclusion that the plaintiff failed to meet the capsule definition of Listing 12.05. However, it permits that conclusion.[9] In such circumstances, this court must refrain from the temptation to resolve conflicts differently than the administrative law judge and substitute its judgment for hers. *See, e.g., Rodriguez*, 647 F.2d at 222 (the commissioner, not the doctors or the courts, must resolve conflicts in the evidence). The administrative law judge committed no error in finding that the plaintiff had failed to demonstrate that she met Listing 12.05.

---

[9] Cases in which, on similar facts, courts have upheld a finding that a claimant did not demonstrate the requisite deficits in adaptive functioning for purposes of the capsule definition of Listing 12.05 include *Arce* and *Geier v. Astrue*, No. 1:07-cv-00020-MP-WCS, 2008 WL 553611 (N.D. Fla. Feb. 28, 2008). *See Arce*, 185 Fed. Appx. at 438 (although claimant stated that she needed help cooking, paying bills, shopping, riding a bus, and taking care of children, there was substantial evidence in the record that she did not have deficits in adaptive functioning when expert consultant indicated there were no significant limitations on her ability to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, set realistic goals, and make plans independently of others, and claimant indicated she could do housekeeping, use a computer, did not need help grooming or communicating, and got along well with people when she worked); *Geier*, 2008 WL 553611, at *4 (for purposes of Listing 12.05, there was substantial evidence of record that claimant had significant functional capacity: she was married, could use a computer to email people, could clean the house, did the cooking, and took care of animals).

### C. Cutoff of Line of Questioning at Hearing

The plaintiff finally complains that the administrative law judge erred in refusing to permit her representative, at hearing, to examine a vocational expert as to the impact of the plaintiff's limitations on jobs that she purportedly could perform. *See* Statement of Errors at 9-12. Specifically, after the plaintiff's representative asked the vocational expert to identify the GED, or General Educational Development, levels of the identified jobs, the administrative law judge cut off the line of questioning, stating: "You know, I'm just going to hold you off there for a minute. We do not apply the GEDs. I know they[] have been flying all around and stuff in different hearings and all that. But the Agency does not rely on the GEDs for any of their decisions. It's not part of our burden." Record at 1012.

The plaintiff's representative objected that there was caselaw touching on the relevance of GED levels, although she was able to cite only one specific case from the United States Court of Appeals for the Eighth Circuit. *See id*. at 1012-13. She stated: "I'd just like to get that information from [the vocational expert]. . . . The GED levels for the jobs. That's all." *Id*. at 1013. The administrative law judge overruled her objection. *See id.*

I find no reversible error. While "[t]he claimant and the representative have the right to question the VE [vocational expert] fully on any pertinent matter within the VE's area of expertise[,] . . . the ALJ [administrative law judge] will determine when they may exercise this right and the appropriateness of any questions asked or answers given." Social Security Administration, Office of Disability Adjudication and Review, Hearings, Appeals and Litigation Law Manual ("HALLEX") § I-2-6-74(C). As counsel for the commissioner noted at oral argument, the plaintiff's representative had already questioned the vocational expert at some

length when, toward the end of an hour-and-a-half-long hearing, *see* Record at 953, 1015, she attempted to examine that expert regarding GED levels, *see id.* at 1007-12.

As counsel for the commissioner stated at oral argument, GED levels for jobs are readily ascertainable from the Dictionary of Occupational Titles (U.S. Dep't of Labor, 4th ed. rev. 1991) ("DOT"). Indeed, the plaintiff obtained GED levels for two of the three jobs at issue. *See* Statement of Errors at 11. From all that appears, there was no GED level information for the third job, that of greeter, which the vocational expert testified was not listed in the DOT and about which he testified on the basis of his experience and expertise. *See* Record at 1000-02. Therefore, even assuming *arguendo* that the cut-off of this line of questioning was predicated on an erroneous premise, no resulting prejudice can be discerned.

## II. Conclusion

For the foregoing reasons, I recommend that the decision of the commissioner be **AFFIRMED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 19th day of July, 2011.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge